**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| AARON CLAY KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-CV-0827-CVE-TLW |
| | ) | |
| OTIS HUGHS, Jail Administrator; | ) | |
| DEPUTY BRENDAN O'DRISCOLL, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This is a 42 U.S.C. § 1983 civil rights action commenced by Plaintiff, a state prisoner appearing pro se. In response to Plaintiff's complaint (Dkt. # 1), Defendants filed a motion to dismiss, or in the alternative, motion for summary judgment and brief in support (Dkt. # 26). Defendants also prepared and filed a Special Report (Dkt. # 25). Plaintiff filed a response to Defendants' motion (Dkt. # 29). For the reasons discussed below, Defendants' motion for summary judgment shall be granted and the alternative motion to dismiss shall be declared moot.

### BACKGROUND

On August 9, 2013, Plaintiff was arrested and booked into the Osage County Jail (OCJ) on a charge of First Degree Murder filed in Osage County District Court, Case No. CF-2013-309.[1] (Dkt. # 25, Ex. 9). Plaintiff filed his civil rights complaint (Dkt. # 1) on December 30, 2013. In the "Nature of Case" section of his complaint, Plaintiff provides the following statement:

---

[1]On December 11, 2014, Plaintiff entered a plea of guilty to an amended charge of First Degree Manslaughter, After Two or More Prior Felony Convictions, and was sentenced to forty (40) years imprisonment, with the first twenty-five (25) years in custody, and the balance suspended. See www.odcr.com.

I was arrested in August 2013 with a broken elbo [sic]. I was not geting [sic] proper medical care. I was also assaulted by an officer and I did not receive medical care!

Id. at 2. Based on those facts, Plaintiff names two (2) defendants: Otis Hughs, Osage County Jail Administrator; and Deputy Brendan O'Driscoll. He identifies two (2) causes of action, as follows:

Count 1:    I have the right to get proper medical attention. I have been medically neglected, which has caused me long term damage.

Count 2:    I have been a victom [sic] of unnecessary excesive [sic] force by Deputy Officer Driscol [sic], and Deputy Officer Wamego of the Osage County Jail.

Id. Plaintiff includes nine (9) handwritten pages providing additional facts in support of his claims.

In support of his first count, Plaintiff alleges, in pertinent part, that,

I was arrested August 19, 2013. I was looked at by a[n] ambulance team. They verified I had a broken elbo [sic]. I was being quistiond [sic] at the Skiatook Police Department. They gave me a sling for my right arm/elbo [sic]. I was brought to the Osage County Jail that day! I was puting [sic] in medical request after medical request[.] I wasn't allowed Tylenol or IB-profin [sic]. All the guards knew I had a broken elbo [sic]! I was put in general population . . . All they had to do was look. They would have seen a bone poking up, about a 1/8 to 1/4 of an inch. It was not missable! I was very pain full. I was given at that time Neproxin [sic] 500 mg twice a day . . . I finly [sic] went to a[n] orthopedic surgen [sic] . . . This was a month after I came to jail. The doctor told me that my elbo [sic] was done with the natural process. They should of brought me in 3 weeks prior to that. He told me I'm going to be in pain for the <u>rest of my life</u>. And I won't be able to extend my arm all the way again! I got my surgery on October the 1st 2013. I got 9 screws and a metal plate inside my arm/elbo [sic]! And around 18 stitches. The nurse told me the doctor had to re-break my elbo [sic]. So I had to go through the healing process all over again. I was given Tylenol 3 for 1 week. Then they took it away from me. I have not been allowed no [sic] rehab. And I was put in general population 2 days after surgery! I went to Doctor Painter 2 weeks later after surgery to get my cast and stitchs [sic] off took another x-ray. He said I was looking good and set me up another appointment for I don't know when. Aparently [sic] their [sic] not going to let me go to my last check up. My surgery cost around $45,000 and Osage County made me pay for it even though their [sic] responsible for all my medical needs and responsible for the bill!

Id. at 2, 5-7. In support of his second count, Plaintiff writes,

2

The morning of September 6th 2013, I ate breakfast, returned to my room, and got back in bed. Shortly after Driscol [sic] came in and requested me to get up and come with him. After getting up, I told Deputy Driscol [sic] I needed to grab my arm sling, and once I turned to retrieve my arm sling, he shouted don't grab shit, and sprayed me with mace, violently handcuffed me, took me up front and cuffed me to a (bull ring), and to this day, I have still yet to know what I was taken up front for.

Id. at 3-4. On separate handwritten pages, Plaintiff adds additional factual information, as follows:

[O'Driscoll] looked around and asked who's King? I sat up and asked what did I do? He told me to stand up! I started to put my arm sling on, that I needed cause I hade [sic] a broken arm, that Osage County won't fix at the time! He said, no stand up. I did, told him I need my sling [be]cause I have a broken elbo [sic], I'm standing now. He told me he doesn't care and sprayed me with mace in my face. He draged [sic] me out of my cell G-5 with no sling, handcuffed me with my hands behind my back after he slamed [sic] my face in to the wall and left a face imprint on the wall from the mace! Then by my handcuffs he jerked my arms almost vertical with my shoulder blades. I screamed with pain, I felt a poping [sic]/grinding feeling in my right elbo [sic]! He draged [sic] me up front to booking. I took a shower trying to get the mace out of my eyes and ears. I was changing. While I'm facing the wall, he cuffs me again. The other officer leaves us alone, I didn't know his name. He don't [sic] work here anymore for some reason. C.O. Driskel [sic] hates U.A.B.s. We get into a verbal argument about my case. He knew the victom [sic] I guess from what he said. He jerked my arms again like before except this time he hit me twice in the right kidney. I started to fall but he had me by the cuffs, holding me up against the wall face first! He told me it would be in my best interst [sic] to cop to my charge after the two right hits to my kidney. I told my mother about that. She told my lawyer but he didn't do nothing [sic]. He tryed [sic] to cuff me to a metel [sic] ring behind my back still. He took me off that, put me in the drunk tank and wouldn't give me my arm sling. I asked to see the nurse. They told me no, that I deserved whatever C.O. Driskel [sic] did to me. I sat up there until diner [sic] time holding my arm in place while all the C.O.s and officers laughed at me all day! I was humiliated and hurting. They wouldn't even bring me a medical slip! The Lt. was aware of it and didn't do anything about it. Usaly [sic] when your [sic] maced you get locked down for 3 days. I didn't get locked down, the other officers knew he was out of line! The whole pod seen what initally [sic] happened. To this day I still don't know why he came into my cell that day!

Id. at 8-9. Plaintiff also describes a second incident involving Defendant O'Driscoll, as follows:

On the morning of November 15th 2013, wich [sic] was a Friday, C.O. Driskel [sic] was doing meds and breakfast. I got up to the front of the line at the bean hole. I signed for my (2) Neproxin [sic] 500 mg pill[s], put it in my mouth took a sip of

3

water and swallowed my pill. He said open up; I open up still half asleep. I guess it wasn't wide enoug [sic], he said open up, I answered come on man we go through this every day shining that bright ass flashlight in my eyes. He said, Fuck you. Now open your damn mouth! I said Fuck you back to him. He told me get up against the wall. I got up against the wall. He came in the pod door . . . He cuffed me up. Before I went out the door, I told Driskel [sic] please be carfull [sic] with my arm. I barely had surgery 6 weeks ago. As soon as the door closed, he grabed [sic] my cuffs or my wrist and pulled up on my arms. I felt a numbing sensation and pop feeling and sharp pain shooting in my elbo [sic]. I yelled in pain (You fucking bitch you broke my arm!) . . . Then C.O. Wamego came grabed [sic] my right arm and together they almost picked me up making me tip toe to booking. He slamed [sic] my face into the glass and busted my lip. I had a fat lip from that. He cuffed me to the bull ring for a hour or two. I asked C.O. Wamego if he was going to let him Dirskel [sic] teach him that kind of shit. I told him I think you guys broke or messed up my elbo [sic] again. Thanks for messing up my $45,000 surgery! I asked to see the nurse! They looked shocked or nervous! After I said that! I seen [sic] the nurse when she got in next shift. She asked me if I was in a fight. I told her no. She told me I had a fat lip. I told her the cops did it to me. I told her my elbo [sic] hurt, probably tore something. She said she set me up a[n] appointment to see the doctor. Which I haven't seen yet . . . I was cut off from medication, still don't know why. My elbo [sic] looks like 3/4s of a golf ball now. You can tell theirs [sic] something wrong with it. I will take a lie detector test to prove I'm telling the truth.

Id. at 10-11. As his request for relief, Plaintiff writes "[d]ue to medical negligence my hospital bills should be paid in full. And longterm [sic] for pain an[d] suffering I should be paid! $200,000.00 mental anguish and excessive force! $100,000.00." Id. at 12.

As directed by the Court, Defendants prepared and filed a Special Report (Dkt. # 25). In response to Plaintiff's claims, Defendants also filed a motion to dismiss, or in the alternative, motion for summary judgment and brief in support (Dkt. # 26). Defendants assert that (1) Plaintiff's claims should be dismissed, pursuant to 42 U.S.C. § 1997e, for failure to exhaust administrative remedies, (2) Plaintiff cannot demonstrate that Defendants violated his constitutional rights, and (3) they are entitled to qualified immunity in their individual capacities. Id.

### III. ANALYSIS

**A. Summary judgment standard**

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996) (quoting Wolf v. Prudential Ins. Co. of America, 50 F.3d 793, 796 (10th Cir. 1995)). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Durham v. Xerox Corp., 18 F.3d 836, 838-39 (10th Cir. 1994).

**B. Summary judgment record**

When, as in this case, "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Johnson v. Roberts, 410 F. App'x 104, 106-07 (10th Cir. 2010) (unpublished)[2]; see

---

[2]This unpublished opinion is cited for its persuasive value. See 10th Cir. R. 32.1(A).

<u>also</u> Fed. R. Civ. P. 56(e)(2).  In their Special Report (Dkt. # 25), Defendants present evidence, including affidavits, medical records, jail records, and state court records, contradicting many of Plaintiff's allegations.  In response to the dispositive motion filed by Defendants, Plaintiff provides no evidence and continues to rely on mere allegations.  (Dkt. # 29).  Plaintiff contends that Defendants are lying and that the investigation conducted by the Sheriff's Office was biased and a coverup.  <u>Id.</u>  He concludes his response by stating that "[i]f they would pay the [medical] bill wich [sic] they are supposed to do, I would be happy with your judgment."  <u>Id.</u> at 3.  After review of the parties' briefs, the Court finds Plaintiff has failed to controvert the following facts presented in support of Defendants' motions for summary judgment.

## 1.  Medical care provided to Plaintiff

First, as to Plaintiff's claim that he has been denied adequate medical care during his incarceration at the OCJ, the records provided by Defendants demonstrate that when Plaintiff was booked into the OCJ on August 9, 2013, he assisted in the completion of a medical questionnaire (Dkt. # 25, Ex. 1 at 52-54).  On that questionnaire, it was noted that Plaintiff had received medical treatment 2-3 weeks previously for a broken elbow and was taking 800 mg ibuprofen as prescribed by a doctor.  <u>Id.</u> at 53.  On August 26, 2013, Plaintiff submitted a written request for medical treatment for "broken elbo [sic], ring worm, cracked heel."  (Dkt. # 25, Ex. 3 at 1).  Plaintiff was seen by the nurse at OCJ on August 27, 2013.  <u>Id.</u>  Carl F. Painter, M.D., an orthopedic surgeon, evaluated Plaintiff's injured elbow on September 16, 2013.  <u>Id.</u> at 14.  Dr. Painter recommended surgical repair of the elbow.  <u>Id.</u> at 15.  On September 18, 2013, Plaintiff was approved for outpatient surgery by Raymond Herr, Chief Medical Officer.  <u>Id.</u> at 16.  The surgery was performed on October 1, 2013.  <u>Id.</u> at 18; Dkt. # 25, Ex. 11 at 3.  In addition, Plaintiff was seen by Dr. Painter

for a post-surgical follow-up on October 16, 2013. (Dkt. # 25, Ex. 3 at 19). On November 21, 2013, Plaintiff requested medical care for his elbow, stating that,

> [O]n the 16th of November Co. Driskel [sic] messed up my elbo [sic] again. I need to see my Dr. in Bartlesville. I need to also ask why my medicine was stoped [sic]. I need my elbo [sic] fixed please, the police messed it up I can't put any pressure on it at all. Your police hyper-extended my arm!

Id. at 22. In response, medical officials scheduled an appointment at Dr. Painter's office for November 25, 2013. Id. On November 25, 2013, Plaintiff was seen by Dr. Painter who determined the elbow was healing appropriately and there was no need for subsequent examinations. See Dkt. # 25, Ex. 11 at 4. Dr. Painter wrote, "I am pleased with his progress. He is very functional the way he is . . . x-rays of the right elbow reveal good position of his hardware and good healing." See Dkt. # 25, Ex. 3 at 51.

### 2. Incident of force on September 6, 2013

As to Plaintiff's first claim of excessive use of force, the records provided by Defendants demonstrate that, on September 6, 2013, before Plaintiff's elbow surgery, Defendant Brendan O'Driscoll, employed by the Osage County Sheriff's Office as a Corporal at the OCJ, learned from another inmate that Plaintiff was engaging in aggressive and disruptive behavior. (Dkt. # 25, Ex. 5 at ¶ 12). O'Driscoll made contact with Plaintiff in Plaintiff's cell and directed him to get up and move against the wall. Id. at ¶ 13. As Plaintiff got up, O'Driscoll saw Plaintiff reach back to his bunk and grab something. Id. O'Driscoll could not see or identify what Plaintiff had in his hand. Id. O'Driscoll ordered Plaintiff to drop what he held in his hand at least three times. Id. at ¶ 14. Plaintiff refused. Id. Plaintiff continued to yell and cuss at O'Driscoll and began to move aggressively toward O'Driscoll. Id. Concerned for his safety, O'Driscoll sprayed Plaintiff with a short blast of pepper spray. Id. at ¶ 16. While being placed in handcuffs, Plaintiff dropped what was

in his hand – a sling for his arm.  Id.   Until Plaintiff dropped the sling, O'Driscoll did not know about Plaintiff's injured elbow or his use of a sling.  Id.  O'Driscoll then escorted Plaintiff, without incident, to the shower area so that Plaintiff could wash off the pepper spray.  Id. at ¶ 17.  After showering, O'Driscoll escorted Plaintiff, again without incident, to a holding cell in the booking area.  Id. at ¶ 18.

The summary judgment record also contains the Declaration of Justin Friend, a Detention Officer at OCJ.  (Dkt. # 25, Ex. 10).  Friend worked in the control tower at the time of the September 6, 2013, incident of force.  Although he was not in a position to observe the events within Plaintiff's cell, Friend did observe O'Driscoll escort Plaintiff from the cell after Plaintiff had been sprayed with pepper spray.  Id. at ¶¶ 11-13.  Friend states that "[it] appeared that Mr. King was escorted to the showers and then on to [a] holding cell without any struggle or incident."  Id. at ¶ 12.  Friend also avers that "[a]t no time do I recall being involved in any request for medical care from Mr. King nor did I observe or was aware, even after the [September 6, 2013] incident involving Corporal O'Driscoll, of any injuries or medical need to Plaintiff requiring medical care. Plaintiff did not appear to be injured by the incident."  Id. at ¶ 15.

Furthermore, nothing in Plaintiff's medical records, as maintained by OCJ, reflect a request for medical care on or in the days following September 6, 2013.  See Dkt. # 25, Ex. 3.  The first medical record dated September 6, 2013, or later, is the record of Dr. Painter's evaluation of Plaintiff's elbow on September 16, 2013.  Id. at 14-15.  In addition, the Declaration of Natasha Hart, LPN, supports the conclusion that Plaintiff did not request and did not receive medical care following the incident on September 6, 2013.  See Dkt. # 25, Ex. 11 at ¶ 7.

### 3. Incident of force on November 15, 2013

As to Plaintiff's second claim of excessive use of force, the records provided by Defendants demonstrate that, on the morning of November 15, 2013, or more than six (6) weeks after his elbow surgery, O'Driscoll and Officer William Wamego were distributing medications to inmates, including Plaintiff. (Dkt. # 25, Ex. 5 at ¶ 22). O'Driscoll handed Plaintiff his medications through the "beanhole" of the closed cell door and O'Driscoll saw Plaintiff put them in his mouth. Id. Pursuant to practices used at OCJ, see Dkt. # 25, Ex. 13 at 8, O'Driscoll required Plaintiff to open his mouth to show that he had swallowed the medicine, see Dkt. # 25, Ex. 5 at ¶ 22. Plaintiff refused to open his mouth. Id. Because Plaintiff refused to open his mouth, O'Driscoll entered the cell and handcuffed Plaintiff behind his back to take him to a holding cell for observation. Id. at ¶¶ 23-24. Plaintiff began to resist as he was being escorted out of his cell. Id. at ¶ 25. O'Driscoll, assisted by Officer Wamego, placed Plaintiff in an "escort hold" which required Plaintiff's arms to be lifted up and out. Id. Plaintiff was taken to a "detox cell" and placed on a "restraint ring" until he calmed down. Id. at ¶ 27. Once he calmed down and was no longer a threat to himself or the detention officers, Plaintiff was uncuffed. Id. at ¶ 28. Plaintiff was asked if he wanted to see medical staff and he declined. Id. at ¶ 29.

In her Declaration, Natasha Hart, LPN, confirms that on November 15, 2013, Plaintiff was seen by the nurse on duty as a followup from the incident earlier in the day. (Dkt. # 25, Ex. 11 at ¶ 7(f)). Significantly, although the nurse noted that the "full range of motion test of the elbow caused 'some discomfort,'" the nurse found no bruising or swelling. Id. In addition, only three (3) days later, on November 18, 2013, "the doctor discontinued Mr. King's prescription for Naproxen due to the inmate's hoarding of medications." Id. at ¶ 7(g); see also Dkt. # 25, Ex. 3 at 25.

The summary judgment record also contains the surveillance video of Plaintiff's escort from his cell to the "detox cell" on November 15, 2013 (Dkt. # 25, Ex. 16).[3] The Court has viewed the video and finds it corresponds to the description of the incident provided in Defendant O'Driscoll's Declaration (Dkt. # 25, Ex. 5 at ¶¶ 20-30). The video shows Plaintiff becoming agitated as he was moved from his cell. It also shows that Officer Wamego assisted Defendant O'Driscoll and they used an "escort hold" to take Plaintiff to a detox cell where he was placed on a restraint ring. The timer on the video demonstrates that Plaintiff was alone, attached to the restraint ring, for approximately one (1) hour. During that time, he calmed down substantially. The video then shows the Officers removing Plaintiff from the restraint ring and returning him to his cell quietly without further incident. At no time during the video was Plaintiff's face slammed into the glass. Nor does it appear that Plaintiff was in obvious pain during the episode.

The record also contains a Jail Incident Report, prepared by Detention Officer James Sykes on November 17, 2013. See Dkt. # 25, Ex. 17 at 4. Officer Sykes states that on November 17, 2013, only two (2) days after the November 15, 2013, incident of force, Plaintiff refused his medications. Id.

---

[3]No surveillance video is available for the September 6, 2013 incident. In his Declaration provided as part of the Special Report, Defendant Hughs explains that "data/images from [the surveillance] cameras is [sic] generally available between 120 and 180 days before being overwritten unless specific action has been taken to preserve special data/images . . . The camera system overwrites the oldest data stored." (Dkt. # 25, Ex. 6 at ¶ 30). By the time Defendant Hughs became aware of Plaintiff's allegations, "none of [the surveillance] cameras had information dating back to September 6, 2013 as any recording that had existed had already be[en] overwritten." Id. at ¶ 33.

## C.  Defendants' arguments

### 1.      Exhaustion of administrative remedies

Defendants first argue that Plaintiff failed to exhaust the administrative remedies available at OCJ, and, therefore, the case should be dismissed.  (Dkt. # 26 at 18-20).  Defendants cite the Prison Litigation Reform Act (PLRA) in support of their argument.  42 U.S.C. § 1997e(a) (providing that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted").  This provision applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002).  Moreover, exhaustion of administrative remedies under the PLRA is required for all inmates seeking relief in federal district court regardless of the type of relief available under the institutional administrative procedure.  Woodford v. Ngo, 548 U.S. 81 (2006); Booth v. Churner, 532 U.S. 731, 741 (2001).  The "failure to exhaust is an affirmative defense under the PLRA . . . ."  Jones v. Bock, 549 U.S. 199, 216 (2007).

The statutory exhaustion requirement is mandatory, and this Court is not authorized to dispense with it.  See Beaudry v. Corr. Corp. of America, 331 F.3d 1164, 1167 n.5 (10th Cir. 2003). However, PLRA exhaustion is not jurisdictional.  A district court may "dismiss plainly meritless claims without first addressing what may be a much more complex question, namely, whether the prisoner did in fact exhaust available administrative remedies."  Woodford, 548 U.S. at 101.  When a court evaluates whether an inmate exhausted his administrative remedies, "[s]ection 1997e(a) says nothing about a prisoner's subjective beliefs, logical or otherwise, about the administrative remedies

that might be available to him. The statute's requirements are clear: If administrative remedies are available, the prisoner must exhaust them." <u>Chelette v. Harris</u>, 229 F.3d 684, 688 (8th Cir. 2000).

Defendants assert that the OCJ has an Inmate Grievance Procedure and that Plaintiff "never submitted an Inmate Grievance form regarding any of his complaints about his treatment in the Jail as required by the jail's Inmate Grievance procedure during the relevant period of Plaintiff's detention in the Jail." (Dkt. # 26 at 20). In support of this claim, Defendants provide a copy of the OCJ Inmate Grievance Procedure (Dkt. # 25, Ex. 15). Defendants also claim that the Declaration provided by Defendant Hughs (Dkt. # 25, Ex. 6) reflects that Plaintiff "did not, at any time, submit any grievance form or Request for Staff associated with these claims concerning his conditions of confinement." <u>See</u> Dkt. # 25 at 9. However, the Court has carefully reviewed Defendant Hughs' Declaration and, contrary to Defendants' allegations contained in both the motion for summary judgment (Dkt. # 26 at 20) and the Special Report (Dkt. # 25 at 9), finds no reference to the exhaustion status of Plaintiff's claims. Furthermore, in response to Defendants' motion, Plaintiff alleges that he "sent 2 Request to Staff and Grievances that was [sic] never answered." (Dkt. # 29 at 1).

While it is undisputed that OCJ has written grievance procedures, <u>see</u> Dkt. # 25, Ex. 15, the record provided by Defendants is inadequate to demonstrate that Plaintiff failed to utilize the available grievance procedures. Therefore, the Court finds that Defendants are not entitled to summary judgment on the issue of exhaustion. However, the Court also finds that, for the reasons discussed below, Defendants are entitled to summary judgment based on application of the governing constitutional standards to the facts as developed in the summary judgment record.

### 2. Uncontroverted record demonstrates no violation of constitutional rights

#### a. Count 1 -- Inadequate medical care

As his first cause of action, Plaintiff claims that he has been provided inadequate medical care while in custody at the Osage County Jail. <u>See</u> Dkt. # 1. He admits that, after being taken into custody, his elbow was surgically repaired. <u>Id.</u> at 3. However, he claims that his elbow was further injured when, on November 25, 2013, he was subjected to violent handcuffing. <u>Id.</u> As a result, he claims he has suffered "long term damage." <u>Id.</u>

A pretrial detainee's right to receive adequate medical care is protected by the Fourteenth Amendment and the standard for evaluating his claim under the Fourteenth Amendment is the same as the standard under the Eighth Amendment: a plaintiff must demonstrate "deliberate indifference to serious medical needs." <u>Garcia v. Salt Lake County</u>, 768 F.2d 303, 307 (10th Cir. 1985). "Deliberate indifference" is defined as knowing and disregarding an excessive risk to an inmate's health or safety. <u>Farmer v. Brennan</u>, 511 U.S. 825, 827 (1994). In <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991), the Supreme Court explained that the deliberate indifference standard has two components: (1) an objective requirement that the pain or deprivation be sufficiently serious; and (2) a subjective requirement that the offending officials act with a sufficiently culpable state of mind. <u>Id.</u> at 298-99. Negligence does not state a claim under § 1983 for deliberate indifference to medical needs. <u>See</u> <u>Green v. Branson</u>, 108 F.3d 1296, 1303 (10th Cir. 1997). "[A] prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." <u>Oxendine v. Kaplan</u>, 241 F.3d 1272, 1277 n.7 (10th Cir. 2001) (internal citations and quotation marks omitted). A delay in medical care only constitutes a constitutional violation where the plaintiff can show that the delay resulted in substantial harm. <u>Id.</u> at 1276.

To the extent Plaintiff sues Defendants Hughs and O'Driscoll in their individual capacity, Plaintiff has failed to controvert Defendants' evidence demonstrating entitlement to summary judgment. Personal participation is an essential element of a § 1983 claim. Bennett v. Passic, 545 F.2d 1260, 1262-63 (10th Cir. 1976); see also Garrett v. Stratman, 254 F.3d 946, 950 n.4 (10th Cir. 2001) (noting that medical official must have "played a role in the challenged conduct" to be liable for an Eighth Amendment violation). As a result, government officials have no vicarious liability in a section 1983 suit for the misconduct of their subordinates because "there is no concept of strict supervisor liability under section 1983." Jenkins v. Wood, 81 F.3d 988, 994 (10th Cir. 1996) (quotation omitted). Instead, a supervisor is liable only if he is "personally involved in the constitutional violation and a sufficient causal connection . . . exist[s] between the supervisor and the constitutional violation." Serna v. Colo. Dep't of Corr., 455 F.3d 1146, 1151 (10th Cir. 2006) (quotation omitted); see also Schneider v. Grand Junction Police Dep't, 717 F.3d 760, 767 (10th Cir. 2013).

Defendant Hughs is the OCJ Administrator. See Dkt. # 25, Ex. 7. The uncontroverted facts demonstrate that Defendant Hughs did not participate in the medical care provided to Plaintiff. See id. Plaintiff cannot hold Defendant Hughs liable in his individual capacity based on vicarious liability. As to Defendant O'Driscoll, nothing in the record suggests that Defendant O'Driscoll participated in the medical care provided to Plaintiff. (Dkt. # 25, Ex. 6). Therefore, the Court finds that Defendants Hughs and O'Driscoll, in their individual capacities, are entitled to summary judgment on Count 1.

Furthermore, the Court finds that even if the personal participation requirement were satisfied in this case, the uncontroverted evidence presented by Defendants demonstrates that

Plaintiff received medical care for his fractured elbow while he was in custody at the OCJ; he simply disagreed with the course of treatment. In addition, nothing in the summary judgment record suggests that any official or health care provider acted with deliberate indifference in providing medical care to Plaintiff. Plaintiff injured his elbow 2-3 weeks before being booked-in at the OCJ on August 9, 2013. He did not submit a written request for medical care until August 26, 2013. (Dkt. # 25, Ex. 11 at ¶ 7(a)). Plaintiff received a medical assessment the next day, August 27, 2013. Id. He was seen again for a follow-up on his elbow on September 2, 2013. Id. at ¶ 7(b). On September 16, 2013, Plaintiff was evaluated by Dr. Painter who performed surgery on Plaintiff's elbow on October 1, 2013. Id. at ¶ 7(b),(c). Plaintiff had a post-op evaluation on October 16, 2013. Id. at ¶ 7(d). On November 25, 2013, or ten days after the second incident of alleged excessive use of force, Dr. Painter again evaluated Plaintiff's elbow and determined that it was healing properly and there was no need for further followup examinations. Id. at ¶ 7(i). The uncontroverted evidence demonstrates that jail officials were not deliberately indifferent to Plaintiff's serious medical condition.

Defendants are also entitled to summary judgment on Plaintiff's claim that they delayed seeking medical attention for him and attempted to cover-up the incidents of excessive use of force by Defendant O'Driscoll. With regard to Plaintiff's allegation that his access to medical care for his elbow was delayed, it is well established that a delay in medical care only constitutes a constitutional violation where the plaintiff can show that the delay resulted in substantial harm. Oxendine, 241 F.3d at 1276. In this case, Plaintiff received surgical repair of his elbow and the surgeon determined that Plaintiff's elbow healed properly. Significantly, he has not provided any evidentiary support for his claim that any delay in receiving medical treatment resulted in substantial

harm.  Id.  The Court finds that the summary judgment evidence on file shows that there is no genuine dispute as to any material fact regarding Plaintiff's claim that officials at OCJ failed to provide prompt medical treatment for his elbow.  Therefore, Defendants are entitled to judgment as a matter of law.

To the extent Plaintiff sues Defendants Hughs and O'Driscoll in their official capacity, Plaintiff has again failed to controvert Defendants' summary judgment evidence.  Claims against a government officer in his official capacity are actually claims against the government entity for which the officer works.  Kentucky v. Graham, 473 U.S. 159, 167 (1985). Under § 1983, a municipality may not be held liable on a theory of respondeat superior.  Seamons v. Snow, 206 F.3d 1021, 1029 (10th Cir. 2000) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)). Instead, the plaintiff must show "that the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action." Camfield v. City of Oklahoma City, 248 F.3d 1214, 1229 (10th Cir. 2001) (internal quotation marks omitted).  To establish municipal liability, a plaintiff must show: 1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged.  City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989).  "A municipality may not be held liable where there was no underlying constitutional violation by any of its officers."  Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993).

As discussed above, Plaintiff has failed to demonstrate any violation of his constitutional rights by any named defendant.  The lack of a constitutional violation by the officers of a municipality precludes a finding of municipal liability.  Hinton, 997 F.2d at 782; Myers v. Okla.

Cnty. Bd. of Cnty. Comm'rs, 151 F.3d 1313, 1317 (10th Cir.1998) ("A plaintiff suing a municipality under section 1983 for the acts of one of its employees must prove: (1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation."). In response to Defendants' motion for summary judgment, Plaintiff fails to controvert Defendants' summary judgment evidence. Therefore, to the extent Plaintiff has sued Defendants Hughs and O'Driscoll in their official capacity, those Defendants are entitled to judgment as a matter of law and their motion for summary judgment shall be granted.

### b. Count 2 -- Excessive use of force

As his second cause of action, Plaintiff claims that he was subjected to excessive use of force on two (2) separate occasions: first, on September 6, 2013, during an incident in Plaintiff's cell resulting in Defendant O'Driscoll's use of pepper spray; and second, on November 15, 2013, when, during a transfer to a holding cell, Defendant O'Driscoll handcuffed Plaintiff and placed him in an "escort hold."[4] See Dkt. # 1.

The Tenth Circuit has summarized the various constitutional amendments governing claims of excessive use of force, as follows:

> Any force used "leading up to and including an arrest" may be actionable under the Fourth Amendment's prohibition against unreasonable seizures. Id. at 1325-26. By contrast, claims of excessive force involving convicted prisoners arise under the Eighth Amendment. Id. "And when neither the Fourth nor Eighth Amendment applies – when the plaintiff finds himself in the criminal justice system somewhere between the two stools of an initial seizure and post-conviction punishment – we turn to the due process clauses of the Fifth or Fourteenth Amendment and their protection against arbitrary governmental action by federal or state authorities." Id. at 1326

---

[4]Defendants explain that an "escort hold" is "a compliance maneuver where the inmate is handcuffed behind his back and the escorting officer takes the inmate's arms and lifts them straight up which causes the inmate to lean forward and allows for less resistance from the inmate." See Dkt. # 25, Ex. 7 at ¶ 11; Dkt. # 25, Ex. 8 at ¶ 15.

(citing <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. 833, 843, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)).

It is therefore well-established that the Fourteenth Amendment governs any claim of excessive force brought by a "pretrial detainee" – one who has had a "judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest." <u>Bell v. Wolfish</u>, 441 U.S. 520, 536, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) (quoting <u>Gerstein v. Pugh</u>, 420 U.S. 103, 114, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975)); <u>see also</u> <u>Graham</u>, 490 U.S. at 395 n.10, 109 S. Ct. 1865.

<u>Estate of Booker v. Gomez</u>, 745 F.3d 405, 419 (10th Cir. 2014).

In this case, the incidents giving rise to Plaintiff's excessive use of force claims occurred while he was a pretrial detainee. As a result, his claims are governed by the due process clause of the Fourteenth Amendment. An excessive force claim under the Fourteenth Amendment targets "arbitrary governmental action, taken without due process . . . ." <u>Id.</u>, 745 F.3d at 423 (quoting <u>Porro v. Barnes</u>, 624 F.3d 1322, 1326 (10th Cir. 2010)). "Force inspired by malice or by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience may be redressed under the Fourteenth Amendment." <u>Id.</u> (quoting <u>Roska ex rel. Roska v. Peterson</u>, 328 F.3d 1230, 1243 (10th Cir. 2003)). To determine whether a use of force is excessive under the Fourteenth Amendment a court considers three factors: "(1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor." <u>Id.</u> "How much one due process 'factor' may 'balance' against another is the subject of little discussion" in Tenth Circuit case law. <u>Porro</u>, 624 F.3d at 1327 n. 1. However, the standard is described as a "high threshold." <u>Bella v. Chamberlain</u>, 24 F.3d 1251, 1257 (10th Cir. 1994).

In both incidents of alleged excessive use of force, Plaintiff fails to controvert the summary judgment evidence demonstrating that he resisted Defendant O'Driscoll's directives. On September 6, 2013, Plaintiff refused to drop what he was holding in his hand and moved aggressively towards

O'Driscoll. On November 15, 2013, Plaintiff refused to open his mouth to show he had swallowed his medication. In both instances, O'Driscoll used the amount of force necessary to handcuff Plaintiff in order to restore order and insure Plaintiff's and his own safety. It is clear that it was reasonable for O'Driscoll to use some amount of force to protect himself, his fellow officers, and Plaintiff during the encounters. Nothing in the summary judgment record suggests that Defendant O'Driscoll's use of force was inspired by malice or unwise excessive zeal.[5] Furthermore, nothing in the summary judgment record suggests that Plaintiff suffered injury during the incidents. In fact, the record, as discussed above, refutes Plaintiff's claims of injury. Therefore, considering Plaintiff's refusal to cooperate, the lack of evidence demonstrating injury attributable to the uses of force, and the lack of evidence demonstrating that O'Driscoll acted with improper motives, the amount of force used by O'Driscoll was reasonable under the circumstances. The Court finds that the summary judgment evidence on file shows that there is no genuine dispute as to any material fact and that Defendant O'Driscoll is entitled to judgment as a matter of law. His motion for summary judgment shall be granted as to the excessive use of force claims raised in Count 2.

---

[5]Although Plaintiff alleges that O'Driscoll "hates U.A.B.s," that O'Driscoll knew the victim of the murder giving rise to Plaintiff's criminal charge, and that, during the incident on September 6, 2013, O'Driscoll "hit [Plaintiff] twice in the right kidney" after Plaintiff was handcuffed in the shower area of the OCJ, see Dkt. # 1 at 8-9, those allegations find no support in the record. Furthermore, Plaintiff fails to controvert the summary judgment evidence demonstrating both the lack of a struggle or other incident in the shower area of the OCJ and his lack of injury resulting from the incident on September 6, 2013. Specifically, in his Declaration, Detention Officer Friend avers that during the incident on September 6, 2013, "Mr. King was escorted to the showers and then on to holding cell without any struggle or incident." (Dkt. # 25, Ex. 10 at ¶ 12). Officer Friend further avers that he did not observe, nor was he aware, "even after the incident involving Corporal O'Driscoll, of any injuries or medical need to Plaintiff requiring medical care. Plaintiff did not appear to be injured by the incident." Id. at ¶ 15. In addition, Plaintiff's medical records (Dkt. # 25, Ex. 3) contain no requests for medical care for injuries attributable to the incident on September 6, 2013.

Lastly, the Court finds that Defendants are entitled to summary judgment on Plaintiff's claim that they attempted to cover-up and conceal the use of excessive force by Defendant O'Driscoll. First, Plaintiff's claim is conclusory, speculative, and lacking in factual support. Of greater significance, the Court has determined above that Defendant O'Driscoll is entitled to summary judgment on Plaintiff's claims of excessive use of force. The Court finds that the summary judgment evidence on file shows that there is no genuine dispute as to any material fact as to Plaintiff's claim that Defendants attempted to cover-up or conceal Defendant O'Driscoll's alleged excessive use of force, as the force used was objectively reasonable under the circumstances, and Defendants are entitled to judgment as a matter of law.

### 3. Qualified immunity

Under the facts alleged in the complaint, Defendants Hughs and O'Driscoll are entitled to qualified immunity as to Plaintiff's claim that he was denied adequate medical care and that he was subjected to excessive use of force. The doctrine of qualified immunity shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law. See Pearson v. Callahan, 555 U.S. 223, 231 (2009). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The qualified immunity inquiry requires analysis of two distinct questions: (1) whether, when taken in the light most favorable to the plaintiff as the party asserting the injury, the plaintiff demonstrates sufficient facts to show the public official's conduct violated plaintiff's constitutional rights; and (2) whether the constitutional right alleged to be violated was clearly established at the time of the alleged violation in a sufficiently analogous factual setting. Saucier v. Katz, 533 U.S. 194, 201 (2001), *abrogated in part by* Pearson, 555 U.S. 223. While it is often desirable to proceed initially

with the first prong, a finding of qualified immunity may be appropriate on either question.  See Pearson, 555 U.S. at 236.

"In rebutting a qualified immunity claim at the summary judgment level, a plaintiff can no longer rest on the pleadings and the court looks to the evidence before it (in the light most favorable to the plaintiff)."  Axson-Flynn v. Johnson, 356 F.3d 1277, 1299 (10th Cir. 2004) (internal citation and quotation marks omitted).  "Once the plaintiff makes this showing, the defendant bears the usual burden of a party moving for summary judgment to show that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law."  Id. at 1299-1300.  "More specifically, the defendant must show that there are no material factual disputes as to whether his or her actions were objectively reasonable in light of the law and the information he or she possessed at the time."  Id. at 1300.  "At all times during this analysis, we evaluate the evidence in the light most favorable to the nonmoving party."  Id.

The Court determined above that neither Defendant Hughs nor Defendant O'Driscoll personally participated in providing medical care to Plaintiff.  Furthermore, the evidence provided by Defendants, viewed in the light most favorable to Plaintiff, demonstrates that no one at OCJ was deliberately indifferent to Plaintiff's medical condition or that Plaintiff was denied adequate medical care in violation of his constitutional rights.  Lastly, the Court found that the force used by Defendant O'Driscoll was reasonable in light of Plaintiff's refusal to cooperate, the lack of evidence demonstrating injury attributable to the uses of force, and the lack of evidence demonstrating that O'Driscoll acted with improper motives.  Accordingly, Defendants Hughs and O'Driscoll, in their individual capacities, are entitled to qualified immunity.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1.    The motion for summary judgment filed by Defendants Hughs and O'Driscoll (Dkt. # 26)

      is **granted**.

2.    The alternative motion to dismiss (Dkt. # 26) is **declared moot**.

3.    This is a final order terminating this action.

4.    A separate judgment in favor of Defendants shall be entered in this matter.


      **DATED** this 9th day of March, 2015.


                                        _____
                                        CLAIRE V. EAGAN
                                        UNITED STATES DISTRICT JUDGE